NTA NATIONAL, INCORPORATED,
Plaintiff,

v.

DNC SERVICES CORPORATION,
Defendant.

Civ. A. No. 79–1567.

United States District Court,
District of Columbia.

Feb. 25, 1981.

Patton, Boggs & Blow, Robert H. Koehler, Richard M. Stolbach, Washington, D. C., for plaintiff.

Ronald D. Eastman, Cadwalader, Wickersham & Taft, Mark C. Ellenberg, Abel J. Mattos, Washington, D. C., for defendant.

HART, District Judge.

A. *The Parties*

1. Plaintiff NTA National, Inc. (NTA) is a New York corporation with its principal place of business in Nanuet, New York. NTA's principal business is the providing of consulting services to commercial and political clients regarding the use of telephones and other means for direct contact with specific segments of the population. Through a subcontractor, Macro Methods,

Inc., NTA has also provided its clients with lists of names, addresses and telephone numbers to be used for such direct contact.

2. Defendant DNC Services Corporation (DNC) is a District of Columbia corporation which enters into contracts on behalf of the Democratic National Committee.

B. *The Negotiations*

3. NTA was retained by the DNC during the 1976 Presidential campaign to design and administer telephone bank operations whose purpose was the identification of voters who supported Jimmy Carter. In support of these phone banks, NTA was to provide the DNC with lists of names, addresses and telephone numbers of registered voters in specified geographic areas.

4. In December, 1976, NTA employees Walter Weintraub and Arthur Leibowitz met with Phillip Wise, Acting Executive Director of the Democratic National Committee to discuss the possibility of a contract between the DNC and NTA. This meeting constituted the initial discussions regarding the possibility of such a contract between the parties. As envisioned by the parties, NTA would assist the DNC in providing accurate lists of voters to Democratic national, state and local campaigns and in instructing the campaigns in the use of such lists under conditions to be agreed on.

5. Further discussions regarding a possible contract between the DNC and NTA were held throughout the spring and early summer of 1977. During this time, Kenneth Curtis was the DNC Chairman. The DNC employees principally involved in these negotiations with NTA were Paul Sullivan, the DNC Executive Director, Ernie Kessler, the Executive Director's Assistant, Rich Stauffer, the Chairman's Assistant, Mary Scheckelhoff, Head of Campaign Services Division and J. D. Nelson, the DNC Administrator. The individuals principally involved in these negotiations on behalf of NTA were Walter Weintraub, Maurice Phillips and Bryant Seaman.

6. In June, 1977, NTA submitted a written proposal for what came to be known as

the Data Bank program (Exhibit 1). This fourteen-page proposal (the "Proposal") described a proposed Data Bank program and outlined the kinds of direct voter contact consultation which NTA could provide to the DNC. In the Proposal, NTA stated that it "could" provide the DNC with a Data Bank which, "ultimately", "should" contain information on all registered voters. With such a Data Bank, there "would" be over fifty-four million households computerized. NTA also stated:

> The Data Bank *should* be developed in an orderly fashion in accordance with priorities based upon candidate need, potential use and political and financial value to the DNC. Conceivably data for 1977 elections would be scheduled first, followed by data needed in key 1978 races. If we begin to move now the data bank *could* be 100 percent completed in time for the 1980 presidential race. (emphasis added)

There is nothing in the Proposal which specifically addresses the issue of whether the DNC or NTA was to pay the costs of data acquisition and installation for the Data Bank program. Similarly, nothing in the Proposal specifically refers to the manner in which the Data Bank was to be marketed, or who had the responsibility therefor.

7. Around the time that NTA submitted the Proposal to the DNC, the DNC requested that NTA undertake research regarding certain geographic areas in order to determine the cost, form and availability of voter information in those areas. NTA undertook this research and submitted the findings to the DNC in two reports, one dated June 27, 1977 (Exhibit 2) and the second dated July 28, 1977 (Exhibit 5). The results of these reports were used by the DNC to analyze the projected cost of the Data Bank program for the purposes of establishing prices for Data Bank sales. The reports contained a breakdown of the various costs which the DNC would incur, through NTA, in installing data into the Data Bank. The reports also demonstrated that the DNC could not charge a standard price for the data without risking a financial loss on the first sale in a given area because of the great variation in data preparation costs from geographic area to geographic area. It was therefore decided that the DNC would price the first sale in an amount equal to the cost to produce data for that particular sale. Also, because the production costs were less for a second sale of the same data, the DNC could realize a profit on multiple sales if it charged all purchasers the same price for the same data.

8. During discussion of the results of NTA's research efforts, the parties agreed that the DNC would pay NTA to undertake data acquisition, preparation and installation for Data Bank sales, and that the price would be the cost to NTA without overhead or profit, so that a first sale of data at cost to a candidate or committee would cover NTA's costs and prevent the DNC from losing money on Data Bank sales.

9. When NTA submitted the Proposal in June, 1977, it attached thereto its proposed terms and conditions for the contract with the DNC. These proposed contract terms specified that the contract period would begin immediately and continue through December 31, 1980. For performance of the contract, apart from the direct costs of Data Bank sales, NTA would receive from the DNC equal monthly payments throughout the proposed contract period.

10. The DNC did not accept these proposed NTA contract terms in their entirety; rather, the DNC asked NTA to propose new terms which specifically included two modifications. First, the DNC requested that the contract provide for a six-month probation period after which the Data Bank program could be renewed if the DNC determined it was successful. Second, the DNC stated that equal monthly payments were unworkable because of DNC cash flow problems, that it could not support the payments asked for per month in the early stages of the contract, but that a payment schedule should be devised which would provide reduced payments in the early stages of the contract to be increased as the presidential election drew nearer and the DNC would be raising more money.

11. By letter of August 11, 1977 (Exhibit 6), NTA submitted to the DNC revised terms for the proposed contract between the DNC and NTA. These August 11, 1977, NTA-proposed terms included the requested six-month trial period, with automatic contract renewal through December 31, 1980 and again through December 31, 1984, unless terminated by either party in writing. The revised proposed terms also contained a payment schedule under which payments to NTA by the DNC would be as follows:

| | |
|---|---|
| September, October, November, December 1977 | $ 6,250 per month |
| January, February 1978 | $ 7,500 per month |
| March through December 1978 | $17,500 per month |
| January through December 1979 | $25,000 per month |
| January through December 1980 | $30,500 per month |

C. *The Contract*

12. The terms were further discussed and revised, and, on August 24, 1977, NTA and the DNC executed a contract under which the DNC retained NTA for services in connection with the DNC Data Bank program (Exhibits 1 and 7). More specifically, the contract terms, identified as the "Agreement" and attached to the Proposal as pages 15–18 thereof, provided that the DNC retain NTA as a ". . . contract consultant, to perform the services necessary to implement the proposal [*i. e.,* the Proposal], including administering the data processing program and consultation with the DNC on all phases of the direct voter contact program." As to specific services, the Agreement provided that NTA was to, among other things,

. . . *collaborate* at all times with the DNC on all matters pertaining to direct voter contact [,]

. . . *at the DNC's request, consult* with local, state and federal candidates and Democratic committees . . . on Direct Voter Contact matters [and]

*assist* all Democratic campaigns, *as directed by the DNC,* in developing direct voter contact programs. (Exhibit 1, p. 15) (emphasis added)

The Agreement further provided that "NTA, as the DNC consultant, shall not be responsible for administration or coordination of any Direct Voter Contact campaign in the field for any candidate or committee." (Exhibit 1, p. 16; Exhibit 7).

13. The DNC's responsibility was described in the Agreement, among other things, as follows (Exhibit 1, p. 16):

The DNC retains the right to grant approval prior to any sales contracts being made by NTA.

The *DNC will be responsible for all itemized costs approved by the DNC incurred in the development and maintenance of the Data Bank* through the Data Bank administrator, NTA. NTA agrees to submit for DNC approval all capital expenditures prior to the time these expenditures are incurred. Operating expenses up to $500 per month do not need prior approval.

*The DNC will determine and control the amount of start-up costs* of the Data Bank for the determination of priority requirements. As the Data Bank program develops, *it should be* possible to defray costs of output by DNC authorized sales.

Where multiple sales of specific output occur, *it should be* possible for *the DNC* to realize a profit. (emphasis added)

14. As to payment, the Agreement stated that the DNC was to pay NTA monthly payments of $6,250 per month for the last four months of 1977 and $7,500 per month for January and February, 1978. It was further provided that compensation for additional terms would be settled at the time of renewal as the parties might agree and that the total compensation for the contract from September 1977 through December 1980 would be $885,000. (Exhibit 1, p. 17).

15. At the time the Agreement was executed in August 1977, both parties intended that NTA was to receive its monthly payments as compensation for providing consultation to such Democratic campaigns or committees as the DNC might direct, and

for administration of the Data Bank program. At all times during negotiation of the Agreement, it was understood by both parties that the DNC was to bear the actual direct costs of acquiring, preparing and installing data for the Data Bank, and that NTA was to carry out such acquisition and installation for the DNC on a cost reimbursement basis. Such reimbursement was to be in addition to the monthly retainer payments to be paid by the DNC to NTA. It was agreed by both parties that it was the DNC which had primary responsibility for promoting the use and sale of the Data Bank program to candidates and committees.

D. *The Initial Six-Month Term*

16. Upon execution of the contract in August, 1977, NTA began to administer the Data Bank; that is, it began to undertake research to determine the cost, form and availability of voter registration information in all states in the United States. Such research involved contacting state and local boards of election throughout the United States. Almost immediately after contract was executed, a Data Bank sale contract was entered into by the DNC with the Howell for Governor campaign in Virginia. NTA produced, on behalf of the DNC, all data sold pursuant to that contract with Howell. Beginning in August, 1977, NTA personnel were available to DNC for direct voter contact consultation.

17. Shortly after the contract was executed, Paul Sullivan, the DNC Executive Director, met with the ten DNC field desk people, each of whom was responsible for a specific geographical region in the United States. At this meeting, Sullivan instructed the field desk people to work with NTA and to promote the Data Bank program by explaining it to candidates and committees and to give NTA leads as to candidates likely to be interested in purchasing Data Bank material. However, although two of the ten field desk people, Hamilton and Peppel, gave some assistance to NTA, most of it in the fall of 1977, none of the field desk people, or any other DNC employees, including the Chairman, ever made any significant effort to promote the Data Bank program.

18. In November, 1977, the DNC and NTA negotiated an amendment to the contract which was executed by Bryant Seaman, on behalf of NTA, and by J. D. Nelson on behalf of the DNC (Exhibit 8). The purpose of the amendment was to set out the method of payment for sales of data in the Data Bank program. Specifically, the Data Bank sales process would be on a break-even basis and proceed as follows: when a candidate or other entity wished to purchase data under the DNC Data Bank program, NTA would establish the price of that sale based on the NTA estimated direct cost of purchasing, processing and printing the data in the form desired by the data purchaser. When the sale was priced, the purchaser would enter into a contract with the DNC and tender fifty percent of the estimated sales price to DNC. DNC would then execute a check in the identical amount to NTA (a "turnaround check") as a down-payment on NTA's out-of-pocket expenses for data purchase, preparation and delivery. Upon receipt of this amount, NTA would acquire and prepare the purchased data, and deliver it to the purchaser, who would, at that time, pay to the DNC the balance due (based on actual output) under the DNC Data Bank contract. The final price was to be determined on actual output and there could be a difference between the estimated price and the final price. The DNC would then issue a turnaround check to NTA in an amount sufficient to cover NTA's total out-of-pocket cost, but not in excess of the amount received from the purchaser. (Exhibits 8 and 26). It was understood that where there was a second sale of the same data, the DNC would retain the difference between NTA's data preparation costs and the contract price. All sales of data which were made under the Data Bank program were processed in a manner consistent with these procedures.

19. During the initial six-month contract term, three Data Bank sales in addition to the Howell sale were made by the DNC

using NTA to carry out the contracts. No evidence was introduced that the DNC was dissatisfied in any way with NTA's performance during this six-month period.

E. *Contract Extension*

20. In late February, 1978, the parties executed Amendment No. 2 to the contract (Exhibit 9). This amendment stated that it "... extends the August 24, 1977 contract between the DNC Services Corporation and NTA National, Inc. from March 1, 1978 until December·31, 1980 ...", and specified the amounts of the monthly retainer payments to be made to NTA by the DNC during that period. During the negotiation of this schedule, the DNC continued its insistence that these monthly payments be "rear-loaded"; that is, most of the compensation was to be paid to NTA at the end of the contract term when DNC's cash flow would be greatest. More specifically, J. D. Nelson, who negotiated the Amendment No. 2 payment schedule, continued to require heavier payments in the last year of the contract because the DNC expected to have substantially greater funds available in the Presidential election year, 1980. The amended payment schedule provided for monthly payments as follows:

| | |
|---|---|
| March 1978 through June 1978 | $10,000 per month |
| July and August 1978 | $15,000 per month |
| September 1978 | $21,000 per month |
| October 1978 through December 1978 | $22,000 per month |
| January 1979 through August 1979 | $16,000 per month |
| September 1979 through December 1979 | $20,000 per month |
| January 1980 through December 1980 | $40,000 per month |

21. During the first several months of 1978, the DNC underwent a substantial turnover in top personnel. John White replaced Kenneth Curtis as Chairman of the DNC in late January, 1978. Evan Dobelle replaced Joel McCleary as Treasurer of the DNC in the spring of 1978, and Dan Horgan replaced Paul Sullivan as Executive Di-

rector of the DNC sometime before May, 1978. Mary Scheckelhoff, head of the Campaign Services Division, also left the DNC sometime before the summer of 1978, and J. D. Nelson, who negotiated and executed the original contract in August, 1977, and signed all the Data Bank contracts entered into during his tenure, left the DNC in August, 1978. As a result of these changes, by August, 1978, the DNC staff no longer contained any of the individuals involved in negotiating or administrating the NTA contract on behalf of the DNC during the initial contract term and, apparently, no one who understood the purposes or administration of the contract.

22. Amendment No. 2 was executed in February 1978 by Bryant Seaman, on behalf of NTA, and by John White, on behalf of the DNC. When he executed this amendment, John White understood that he was extending the term of an existing DNC program. However, other than a possible briefing from one of his subordinates, White made no effort to familiarize himself with the nature of the program he was extending. Moreover, prior to the DNC's termination of the contract in May, 1979, White had never read NTA's June, 1977 Proposal, had never reviewed any of the Data Bank contracts entered into by the DNC, and, at trial, he had no specific recollection of ever having read the original contract or either of the amendments. In addition, there is no evidence in the record that White discussed with NTA the Data Bank program or NTA's requirements thereunder, either prior to or after executing Amendment No. 2. Further, there is no evidence in the record to indicate that, prior to the termination of the contract in May, 1979, White or any other DNC representative communicated to NTA any belief on their part that the program renewed by Amendment No. 2 was to be different than the program conducted prior to that amendment.

23. After extension of the contract by Amendment No. 2 in February, 1978, NTA continued to provide Data Bank administration functions to the best of its ability with-

out help from DNC and continued to maintain at least two employees at DNC headquarters for this purpose. The activities of these employees included preparation of a brochure describing the Data Bank program (Exhibit 10), research regarding data cost, availability and form, and processing and data preparation (through Macro Methods) for Data Bank sales. The NTA employees at DNC headquarters and other NTA employees traveling on behalf of the Data Bank program and located at NTA's New York offices were also available for direct voter contact consultation. Around this time, due to lack of DNC effort, NTA also increased its promotional efforts to publicize to campaign and state political committees the existence and value of the Data Bank program. DNC made no effort to assist in these promotional efforts.

24. On or about May 4, 1978, NTA, on its own initiative, submitted to the DNC the first of a series of status reports regarding the Data Bank program. This report, dated May 4, 1978 (Exhibit 11) outlined, on a state-by-state basis, the progress which NTA had made in identifying the costs, form and availability of voter registration data in much of the United States.

25. Shortly after submitting this report, Walter Weintraub of NTA met with Dan Horgan of the DNC to discuss the Data Bank program. At that meeting, Weintraub explained the efforts which he had undertaken to promote the Data Bank, including meeting with the Democratic Senate and House Campaign Committees, and requested of Horgan that the DNC increase its efforts to inform Democrats around the country, particularly State Chairmen, of the existence, uses and merits of the Data Bank. Horgan agreed to do this, but no effort of the kind requested was ever made by Horgan. Horgan informed Weintraub that John White knew nothing about Data Bank program activities. To inform White, NTA submitted a second report on or about June 12, 1978 (Exhibit 12) which listed the jurisdictions and the number of voter households which had been installed in the Data Bank, and identified the campaigns and geographic areas for which NTA was at

that time negotiating additional Data Bank sales. This status report was directed specifically to John White. Additional status reports updating the June 12, 1978 report were also submitted by NTA in July, 1978, August, 1978 and November, 1978 (Exhibits 13, 14 and 15).

26. In August, 1978, Arthur Leibowitz, the President of NTA, met with Evan Dobelle, the DNC Treasurer, to discuss in detail the August, 1978 Data Bank status report (Exhibit 14). Leibowitz explained to Dobelle the value of the data already installed in the Data Bank and the potential for income to the DNC from Data Bank second sales. At this meeting, Leibowitz also discussed the problems which NTA was having as a result of the lack of cooperation from the DNC with the Data Bank program. Among these problems were the DNC's refusal to permit NTA to participate in the DNC's campaign services seminars and the failure to refer candidates visiting DNC headquarters to the NTA representatives there.

27. In August, 1978, shortly after J. D. Nelson left the DNC, representatives of NTA had additional meetings with DNC representatives on a number of occasions to discuss other matters related to the Data Bank. On one occasion, Arthur Leibowitz met with Evan Dobelle to request direction by Dobelle as to which DNC employee was authorized to replace J. D. Nelson in signing the DNC Data Bank contracts. In response, Dobelle designated David Phelps. At that time, NTA also discussed the difficulty it had been experiencing in receiving a particular turnaround check from the DNC pursuant to a Data Bank sale. At Dobelle's instruction, NTA, in a memorandum addressed to Donna Sagemiller, a consultant to the Controller of the DNC, described the procedures previously used. (Exhibit 26). After transmittal of this memorandum to Donna Sagemiller, NTA had no further problems receiving turnaround checks, and processing of the Data Bank sales continued as it had since the establishment of the Data Bank program. There is no evidence that any DNC employ-

ee or official ever questioned (either orally or in writing) the propriety of those procedures. To the contrary, though the DNC was late in paying NTA the contractually-specified August fee of $15,000, that fee was paid on September 6, 1978 and the September fee of $21,000 was paid less than three weeks later, on September 26, 1978.

28. Though NTA continued providing services to the DNC Data Bank program and in fact prepared data on behalf of the DNC in fulfillment of at least 28 Data Bank sales contracts through October, 1978, (Exhibit 22), the DNC failed to make its monthly retainer payments to NTA in October, November and December, 1978. In early November, 1978, Walter Weintraub, NTA's Director of Operations, called Evan Dobelle to determine the reason for the DNC's nonpayment. Dobelle replied that the DNC lacked sufficient funds to make the payments, but he assured Weintraub that NTA would be paid as soon as possible.

29. In mid-November, 1978, Arthur Leibowitz met with David Phelps, Evan Dobelle's Assistant, to again inquire as to when these monthly payments would be forthcoming. Phelps, like Dobelle, responded that the reason the DNC was not making the monthly payments to NTA was that the DNC did not have sufficient funds for such payments. At no time during this discussion did Phelps indicate (either orally or in writing) that the failure to make payments to NTA was based on any problems which the DNC had with NTA's performance of the contract.

30. Leibowitz had a second meeting with Phelps several days after the first meeting. Also present at that time were Donna Sagemiller and Cecil Cheeves, the DNC House Counsel. At this meeting, the three DNC representatives requested that Leibowitz explain to them the Data Bank program including what it was, how it worked and what it was designed to do. Leibowitz explained the activities which NTA was carrying out under the Data Bank program, the service it could provide a candidate, and complained that NTA was experiencing significant difficulties because of the lack of cooperation by the DNC staff with the program. The DNC personnel replied that they would do what they could to remedy this problem of non-cooperation. At no time did Phelps, Sagemiller or Cheeves express any displeasure with the Data Bank program or NTA's performance under its contract with the DNC.

31. During the same period, shortly after the November, 1978 election, NTA, on its own initiative, undertook substantial research to identify the areas nationwide for which elections would be held in 1979. This research was compiled in a document (Exhibit 17) which also specifically identified those 1979 races where the DNC could sell data already installed in the Data Bank and thereby realize a profit. This document was circulated throughout the DNC and was used by the DNC as an information source for the 1979 elections.

32. DNC's nonpayment of monthly payments continued through December, 1978, and Walter Weintraub traveled to Washington, D. C., to meet with Evan Dobelle on January 4, 1979 to discuss payments. At that meeting, Dobelle acknowledged both the DNC's obligation to continue payment to NTA and the DNC's lack of payment for the October-December, 1978 period. Dobelle also offered Weintraub a payment plan under which the DNC would bring up to date the DNC's payments under the contract. Dobelle stated that the DNC would make its January, 1979 payment at the end of that month, make its February, 1979 payment at the end of February, and pay the $66,000 balance due from October through December, 1978, after a fundraiser which the DNC was to hold in Los Angeles sometime in March, 1979. This agreement was memorialized in a note which Dobelle transmitted to Weintraub shortly after the meeting (Exhibit 18). At no time during this January 4, 1979 meeting did Dobelle suggest that the DNC was displeased with the performance of NTA under the Data Bank contract.

33. During the first four months of 1979, NTA continued to have personnel available at the DNC for direct voter con-

tact consultation and continued to provide Data Bank administration services. These efforts included the commencement of the updating of all information regarding voter registration data, cost, form and availability (Exhibit 31). The DNC made its January and February monthly retainer payments in accordance with the agreement reached between Evan Dobelle and Walter Weintraub on January 4, 1979. In early 1979, the DNC executed turnaround checks as a result of Data Bank sales to the Campbell campaign in the District of Columbia and the Hardy campaign in Louisiana. In March, 1979, shortly after the DNC's Los Angeles fundraiser, the DNC paid NTA $33,000 toward the $66,000 balance due to NTA for October, November and December, 1978.

34. The DNC made no further payments to NTA after the $33,000 paid in March, 1979. Because of this failure to make payment, in late March, 1979, Walter Weintraub attempted several times to contact Evan Dobelle. Dobelle finally called back and spoke to Arthur Leibowitz. At that time, Dobelle instructed Leibowitz: "... Walter knows he's going to get paid and I gave him a note promising to pay him and he will be paid". Shortly thereafter, Walter Weintraub spoke with David Phelps. Phelps responded by asking that NTA "... bear with him", and stated that NTA would get the remaining $33,000 due for 1978, as well as the March, 1979 payment, by April 1, 1979. When such payments were not made, Weintraub contacted Phelps by telephone on or about April 5, 1979. At that time, Phelps stated that neither he nor Chairman White understood what NTA was doing, and the implication was that neither White nor Phelps had any understanding of the nature or purposes of the contract with NTA. Weintraub then offered to have Larry Storm, one of the NTA representatives at the DNC headquarters, answer any of Phelps' questions about the Data Bank program. To this offer, Phelps responded simply that "the Chairman doesn't want to know what you are doing and we are not going to pay you".

35. In late March, 1979, Peter Kelly replaced Evan Dobelle as Treasurer of the DNC. Shortly after joining the DNC, Kelly made a review of the DNC's financial obligations including the obligations to NTA under the contract in dispute here. Kelly's review consisted, among other things, of reading the contract and asking two of his subordinates, David Phelps and Cecil Cheeves, to advise him of the nature of the services which had been performed by NTA under the contract. In response, Phelps and Cheeves informed Kelly that NTA had been installing data into the Data Bank on a sale-by-sale basis and that the DNC had been transferring most of the sale proceeds to NTA. In his investigation of the NTA contract, Kelly did not review any of NTA's status reports, nor examine the DNC contract files containing copies of the Data Bank sales contracts, nor contact NTA to discuss the nature of the contract or any prior performance thereunder, nor contact Evan Dobelle or any other member of the DNC staff (other than Phelps and Cheeves) to gain further information regarding the DNC's contract with NTA. Based on the limited information he received from Phelps and Cheeves, neither of whom had any exhaustive information of the NTA contract and its operation, Kelly determined that DNC would terminate the NTA contract. On May 8, 1979, the DNC sent counsel for NTA a letter stating that there had been a "failure of consideration" and that the contract was therefore terminated (Exhibit 24).

36. At no time during the entire period of the contract performance, from August 24, 1977 through April, 1979, did the DNC give NTA any written notice that NTA's performance was not in accordance with the requirements of the NTA–DNC contract. Other than a possible suggestion to one of NTA's employees that payments to NTA would be stopped because the Chairman was displeased, for which suggestion there is no direct testimony in the record, the DNC similarly never gave NTA any oral notice before May, 1979 that NTA was not fulfilling its contractual obligations to DNC.

37. NTA provided a constant level of services throughout twenty months of the

contract. These services included carrying out all research and sales processing activities necessary for performance of the 29 completed DNC Data Bank sales contracts, targeting areas where the Data Bank could be sold, undertaking substantial Data Bank marketing and promotional efforts and providing all direct voter consultation requested by the DNC. This level of services appeared to be satisfactory to the DNC officials involved in the negotiation of both the original contract and the two amendments thereto. That satisfaction is clearly evidenced by Amendment No. 2 itself, which extended the contract for 34 additional months and provided for payment to NTA of $845,000 over that period. As of May, 1979, NTA had installed approximately 3,200,000 voter households in the Data Bank. During its 20 months of performance, NTA received from the DNC $196,000 in monthly payments and $123,757.87 in reimbursements for data acquisition, preparation and installation costs.

38. Throughout the contract term, NTA made every reasonable effort to keep the DNC informed regarding the status of the development of the Data Bank and NTA's activities under the Data Bank contract, both by the submission of written reports and by responding to all DNC inquiries.

39. Though the DNC made its monthly payments in a reasonably timely manner through September, 1978 and executed turnaround checks to NTA for all Data Bank sales, the DNC made no significant efforts to promote the Data Bank program or integrate that program into the DNC's candidate assistance activities. Further, the record, when viewed as a whole, clearly establishes that the DNC officials who succeeded the officials involved in negotiation of the contract and the amendments thereto had no real familiarity with the program and made no reasonable efforts to apprise themselves of the nature of the program established by their predecessors or of the conditions and requirements of the contract related thereto. Moreover, the DNC's failure to make the October, November and December, 1978 payments and its subsequent termination of the contract were un-

related to NTA's performance under the contract and were motivated solely by financial considerations of DNC. Up to the termination of the contract by DNC, NTA had performed all its duties and obligations under the original Data Bank contract and all amendments thereto.

## CONCLUSIONS OF LAW

Any Finding of Fact set forth herein which is a Conclusion of Law shall be deemed as such, and any Conclusion of Law which is a Finding of Fact shall be deemed as such.

1. This is an action for breach of contract in which NTA fulfilled all its contractual obligations and is therefore entitled to receive full compensation for the services which it provided to the DNC. DNC has counterclaimed for all sums paid to NTA under the contract ($319,757.87), claiming that there was a "failure of consideration" (Exhibit 24) and that NTA's performance was "insignificant". Accordingly, it is necessary for the Court to determine, first, the terms of the contract; second, the extent to which the parties carried out their obligations thereunder; and third, the value of NTA's uncompensated services.

2. In determining the terms of the contract, this Court must look first to the language of the writings memorializing the agreement between the parties. Here, the written contract between NTA and the DNC consisted of an "Agreement", executed on August 24, 1977 (the "Agreement" —Exhibit 1, Exhibit 7), two amendments thereto, one dated November 16, 1977 ("Amendment No. 1"—Exhibit 8), and one executed around the end of February, 1978 ("Amendment No. 2"—Exhibit 9). In addition, the Agreement incorporated by reference the June, 1977 proposal submitted by NTA to the DNC (the "Proposal"—Exhibit 1).

3. The language of the Agreement and the Proposal indicated that NTA's services were to be of two basic types: one, the provision of direct voter contact consultation in support of DNC activities, and two,

the administration of a Data Processing Program (the Data Bank).

4. The obligations of NTA regarding direct voter contact consultation can be established from the terms of the Agreement and the Proposal. Both documents describe NTA's role as one of availability for "consultation", and are unambiguous in stating that NTA was only to "assist" and "collaborate at the DNC's request".

5. Because NTA had employees available to DNC and Democratic candidates and committees for such consultation at all times relevant to the contract under dispute, NTA fulfilled its direct voter contact obligations. That the DNC neglected to use NTA's available services, except in a minor way, does not alter the DNC's obligation to compensate NTA for making such services available.

6. Based on the record herein, it must be concluded that NTA's Data Bank obligations under the contract consisted of administration of the Data Bank sales process, including conducting research as to the cost, form and availability of data, and carrying out the acquisition and data preparation necessary to fulfill any and all DNC Data Bank sales. The actual costs of data preparation were to be borne solely by the DNC, just as any profits realized from follow-up sales would inure to the benefit of the DNC. The turnaround payments were properly made to NTA.

7. These conclusions are consistent both with the terms of the written agreement between the parties (including the Proposal, the Agreement and the two amendments), and with the circumstances of the contract and the intent and performance of the parties, which facts the Court may examine in order to give meaning to the terms of the written agreement. *United States v. Bethlehem Steel Corp.*, 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731 (1907); *Union Bank v. Winnebago Industries, Inc.*, 528 F.2d 95 (9th Cir. 1975); *International Brotherhood of Painters and Allied Trades v. Hartford Accident and Indemnity Co.*, 388 A.2d 36 (C.A. D.C.1978); *Svestka v. Pell*, 224 A.2d 478 (C.A.D.C.1966).

8. The Proposal described the Data Bank program in purely conditional terms; it stated it "could" be completed by the 1980 Presidential race and "ultimately" should contain information on all 54,000,000 American voter households. It also stated that the Data Bank "... should be developed in an orderly fashion in accordance with priorities ...." However, under the terms of the Agreement, it is the DNC which controlled those priorities (Exhibit 1, p. 16). Therefore, rather than *require* NTA to place the entire nation in the Data Bank prior to the 1980 Presidential race, the Proposal required that the rate of development was to be determined *by the DNC.* It was contemplated that in large part Data Bank information would be assembled only as, if and when an order for same in a particular area was received by DNC.

9. The Agreement addressed the Data Bank program in the provisions relating to "DNC responsibility" (Exhibit 1, p. 16). Those provisions made the DNC responsible for "... all itemized costs approved by the DNC incurred in the development and maintenance of the Data Bank through the Data Bank administrator NTA." Any profits realized by the Data Bank program inured to the benefit of the DNC, and the DNC had ownership of all data developed (Exhibit 1, pp. 16–17).

10. These terms evidence the fact that the Data Bank was established as a DNC program with NTA providing the services through which the program was to be implemented.

11. Also consistent with this reading of the contract is the language of Amendment No. 1, which amendment was intended to establish the basis for sales of data "*between the DNC Services Corporation* and candidates or committees." Payments for data were made by the purchaser *to the DNC.* If a purchaser defaulted, the DNC was to transfer the fifty percent downpayment to NTA "... *if the DNC Services Corporation had not already done so."* Thus, these terms all described the Data Bank program as a *DNC* program. They

further recognized that transfers of funds to NTA after receipt from Data Bank purchasers were to occur *as a matter of course* and without regard to the default on a sales contract. Thus the terms of the parties' written agreement all support the conclusion that NTA was retained under the contract to assist the DNC in implementing the Data Bank program; the ultimate financial and administrative responsibility for the program remained with the DNC.

12. Even if the terms of the written agreement were viewed as incomplete or somewhat ambiguous, this Court may determine the meaning of the contract by reference to the negotiations between the parties and their performance under the contract. As the District of Columbia Court of Appeals stated in *International Brotherhood, supra*:

. . . particularly significant [in interpreting a contract] is extrinsic evidence concerning the parties negotiations prior to and contemporaneous with the formation of the agreement, as well as their course of conduct under the contract. 388 A.2d 36 at 43.

*See also Union Bank, supra*, and *Bergman v. Parker*, 216 A.2d 581 (C.A.D.C.1966). In the case at bar the evidence confirms that the responsibility for the cost of data acquisition, preparation and installation into the Data Bank was intended to rest with the DNC, that the DNC decided at the beginning of the Data Bank program that such installation was to take place only where the cost thereof could be recovered through a Data Bank sale and that the primary responsibility for Data Bank promotion and marketing rested in the DNC, not NTA.

13. During negotiations, the DNC requested that NTA undertake certain preliminary research regarding the cost of data acquisition, preparation and installation. The discussion regarding this research focused on costs to the DNC and profits which would accrue to the DNC upon *multiple* data sales. If the parties had intended that NTA was to pay the cost of acquisition, preparation and installation of data, these discussions would have been unneces-

sary for the DNC's only financial liability would be monthly payments to NTA. Similarly, if NTA absorbed these data costs and was not to receive the proceeds of the Data Bank sales, the DNC would realize the profits on first sales of data, rather than multiple sales. It is clear that DNC's claim that NTA was to pay the costs of data acquisition, preparation and installation out of the monthly retainer fees was never the intention of the parties.

14. The unrefuted testimony of Walter Weintraub of NTA, and of J. D. Nelson, the former DNC Administrator who was involved in most of the contract negotiations, clearly shows that the understanding of the parties was that the DNC had to bear the costs of data preparation, that the DNC would meet those costs through data sales to candidates and campaigns, and that NTA had no obligation to install data into the Data Bank independent of a Data Bank sale by DNC.

15. The performance of both parties under the contract, from its signing in August, 1977 through its termination in May, 1979, was consistent with this initial understanding. Over the nineteen-month period from August, 1977, through March, 1979, the DNC paid NTA $196,000 in monthly payments and over $123,000 in reimbursements for data acquisition, preparation and installation costs. Further, though the procedures for processing the Data Bank sales, and the reimbursements to NTA therefor, were specifically addressed in Amendment No. 1 and discussed in detail among representatives of both NTA and the DNC several months later in August, 1978 (Exhibits 8 and 26), neither during the negotiation of Amendment No. 1, nor the discussion in August, 1978, nor at any other time during the period the contract was in force did the DNC ever question the propriety of making such reimbursements to NTA. Such DNC personnel as had any knowledge of the contract negotiations and operations thereunder were aware that NTA was installing data into the Data Bank only as sales of such data were made to candidates and campaigns by DNC, yet no DNC objection

was raised to that practice at any time prior to the DNC's termination of the contract. These facts establish that both parties to the contract intended and understood that the DNC had sole responsibility for the cost of acquisition, preparation and installation of data into the Data Bank, and that NTA was to install data into the Data Bank only when such data was sold pursuant to a Data Bank sales contract with DNC.

16. As regards Data Bank marketing and promotion, J. D. Nelson testified that the parties understood when they signed the contract that it was the DNC which had primary responsibility for promoting the Data Bank program. Confirming this is the fact that shortly after the contract was signed, Paul Sullivan, the DNC Executive Director, instructed the DNC campaign services staff to establish leads for and promote the Data Bank program. In 1977, to a very limited extent, some of the DNC staff followed these instructions. It was only when these DNC marketing efforts and other cooperation ceased almost entirely in early 1978 that NTA voluntarily increased its own promotional efforts in an attempt to compensate for the DNC's lack of cooperation, as required by the contract. NTA complained, first to J. D. Nelson and Dan Horgan, then to Evan Dobelle, and later to David Phelps regarding the DNC's lack of involvement in Data Bank promotion. All of these DNC officials concurred with NTA's view of the DNC's performance deficiencies and gave assurances that the DNC performance would be improved. In short, *all* credible evidence in the record establishes *the DNC's* responsibility for marketing and promotion of the Data Bank program. This Court concludes that NTA's interpretation of the contract was reasonable and consistent with the letter of the agreement and the intent and performance of both parties.

17. The DNC has argued, in the alternative, that even if this Court finds that NTA's interpretation of the contract is reasonable, the DNC's interpretation, that NTA was to install the entire country into the Data Bank by Presidential elections of 1980 in return for the monthly retainer payments, is equally reasonable. Therefore, the DNC asserts, there was no meeting of the minds from which a contract could result. This argument is based on an allegation that, at the time he executed Amendment No. 2, John White's understanding of the contract terms differed from NTA's understanding of those terms. The fact is that when White signed Amendment No. 2 he had no knowledge of the terms of agreement or how it had operated in the past.

18. This DNC argument is without merit and has no basis in fact or practice under the agreement. It is well established that parties to a contract will be held to a reasonable interpretation of that contract and will not be permitted to assert their individual subjective intent. *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, 246 A.2d 784 (C.A.D.C.1968); *1901 Wyoming Avenue Cooperative Association v. Lee*, 345 A.2d 456 (C.A.D.C.1975). Further, as the D. C. Court of Appeals stated in *1901 Wyoming Avenue Cooperative Association, supra*:

> The presumption is that the reasonable person knows all of the circumstances before and contemporaneous with the making of the integration [of the contract]. The reasonable person is also bound by all usages—habitual and customary practices—which either party knows or has reason to know. The standard is applied to the circumstances surrounding the transaction and the course of conduct to the parties under the contract .... 345 A.2d at 461–462. (emphasis added)

19. In this case, Amendment No. 2 specifically states that it extended the August 24, 1977 contract between the parties, and John White testified that he understood that he was executing the extension of an existing program. As already explained, the negotiations between the parties and their performance during the first six months of contract performance establish that the "existing program" consisted only of NTA making its services available

for direct voter contact consultation and acting as Data Bank administrator by carrying out the tasks necessary to deliver data pursuant to Data Bank sales by DNC. Nothing in the contract documents nor the performance of the parties indicated that NTA was to put all fifty-four million American voter households into the Data Bank by the 1980 Presidential election without a DNC direction to do so and without DNC reimbursement to NTA for the data acquisition, preparation and installation costs related thereto. Under the above cited rule of *1901 Wyoming Avenue Cooperative Association*, White must be presumed to have knowledge of these facts. He thus had no reasonable basis upon which to believe that a simple extension of the existing program would mean a substantial alteration in NTA's obligations under the contract.

■ 20. Moreover, even if it was assumed that Chairman White had some subjective belief regarding the terms of the contract, it is a well-established principle that:

> ... the subjective *unexpressed, uncommunicated* thoughts of a party are *irrelevant* to *the material issue of the parties' intent. Union Bank v. Winnebago Industries, Inc.*, supra, at page 99 (emphasis added).

*See also David Nassif Associates v. United States*, 557 F.2d 249 (Ct.Cl.1977). There is no evidence that John White ever discussed the contract with NTA at any time during the twenty months the contract was enforced or articulated his belief as to the contract terms prior to execution of Amendment No. 2.

21. The only reasonable interpretation of the contract is that NTA was required to administer the Data Bank program by carrying out all research and sales processing activities necessary to fulfill all Data Bank sales contracts made by DNC and to install any additional data as the DNC might direct with costs to be reimbursed by DNC. As compensation for this Data Bank administration as well as for its availability for direct voter contact consultation, NTA was to receive the monthly retainer pay-

ments specified in the Agreement and in Amendment No. 2. In addition, NTA was to be reimbursed for all costs of data acquisition, processing and installation into the Data Bank.

22. Because this Court has found that NTA carried out all research and Data Bank sales processing activities necessary to fulfill all Data Bank sales contracts, and because there is no evidence that the DNC directed NTA to install any data into the Data Bank beyond that which was installed, NTA has fulfilled all its Data Bank-related contractual obligations. NTA fulfilled all its direct voter contact consultation obligations.

■ 23. Because NTA had fulfilled all its contract obligations and the contract specified that the period of performance was to continue through December 31, 1980, the DNC's termination of the contract by letter of May 8, 1979 (Ex. 24) constituted an unjustified repudiation of the contract.

■ 24. This Court may fashion relief in a manner which fairly and reasonably compensates NTA for the damages it suffered as a result of the DNC's breach. *Dravillas v. Vega*, 294 A.2d 363 (C.A.D.C. 1972); *District News Company v. Goldberg*, 107 A.2d 375 (D.C.Mun.1954). Since there is no evidence in the record regarding prospective lost profits, the proper measure of damages to NTA is the value of NTA's uncompensated services up to the date the contract was improperly repudiated by DNC.

25. On May 8, 1979, at the time the DNC notified NTA that the contract was terminated, the DNC had paid NTA only $196,000 in monthly retainer payments, some $65,000 less than was required under the contract up to that time. (Exhibits 1 and 9). The DNC has argued that, even if the Court finds that NTA did not breach the contract, the proper measure of damages is the $65,000 unpaid balance. This argument must fail, for such an award would, in essence, be a condonation by the Court of the DNC's breach of a contract and would fall short of NTA's actual damages.

26. The Agreement reflects the parties acknowledgement that the value of NTA's services was $885,000 for the forty-month period from the end of August, 1977, through December 31, 1980 (Exhibit 1, p. 17). The written contract also indicates that during the entire period of performance, NTA was to provide a constant level of services, as DNC Treasurer Peter Kelly admitted at trial. Thus, as the unrefuted testimony of NTA's Walter Weintraub and the DNC's J. D. Nelson confirmed, the heavily end-loaded contract payment schedule (which specifies payment of $480,000 of the $885,000 in 1980) does not reflect the value of NTA's services. Rather, it was requested by the DNC solely to accommodate the DNC's ability to pay NTA the bulk of the contract price during an election year when the cash flow of DNC was greatest. It follows that an award based on the payment schedule would not be reasonably related to the damage suffered by NTA but rather to the cash flow of the DNC. Such a result would be inequitable, for it would permit the DNC to benefit from its breach by being relieved of the obligation to pay NTA the full value of services rendered by NTA to the date of DNC's breach of contract.

27. Based on the mutually agreed price of $885,000 over a forty-month contract term, the true value of NTA services was $22,125 per month. NTA provided services to the DNC for twenty months, beginning in late August, 1977 and ending in early May, 1979. The value of NTA services provided to the DNC under the contract was therefore $442,500. The DNC, however, paid NTA only $196,000 for these services. The value of NTA's uncompensated services is thus $246,500.

28. Judgment will be entered in favor of NTA against DNC in the amount of $246,500 with interest at six percent (6%) running from May 8, 1979 to the date of payment and costs. The DNC's counterclaim will be dismissed with prejudice.